DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**VILLAGE OF TEQUESTA,**
Appellant,

v.

**TARA LUSCAVICH,**
Appellee.

Nos. 4D16-2432 and 4D16-4081

[March 7, 2018]

Consolidated appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Richard Oftedal, Judge; L.T. Case No. 50-2013-CA-004938-XXXX-MB.

Jeffrey L. Hochman and Damian H. Albert of Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., Fort Lauderdale, for appellant.

Isidro M. Garcia of Garcia Law Firm, P.A., West Palm Beach, for appellee.

CONNER, J.

The Village of Tequesta ("the Village") appeals the final judgment after a jury found in favor of Tara Luscavich ("the Employee"), on her workplace retaliation claim under the Florida Civil Rights Act ("the FCRA"). The Village raises the analytically challenging question: Can an employee's rejection of one-event sexual advances by a supervisor at a non-work-sponsored party meet certain necessary elements of a claim for retaliation under the FCRA?

The Village contends the trial court erred in (1) denying its motion for directed verdict, (2) denying its requested jury instructions and verdict form and giving erroneous instructions, (3) denying its motion for new trial attacking evidentiary rulings and the Employee's closing arguments in violation of a pretrial order granting the Village's motion *in limine*, and (4) granting the Employee's motion for fees and costs. We affirm the denial of the motion for directed verdict and explain our reasoning. We reverse and remand for a new trial, finding error regarding the causation instruction. We affirm without discussion the denial of the motion for new trial.

Because we are reversing for a new trial, we also reverse the award of attorney's fees and costs.

*Background*

At all times pertinent to this appeal, the Employee was a dispatcher in the Village's police department. During a good portion of the pertinent times, Gerald Pitocchelli ("the Chief") was the police chief of the Village. The initial event leading to the lawsuit below occurred at a private, non-work-sponsored party held at a Village police officer's private residence where members of the Village police department, including police dispatchers, were celebrating the homeowner's (not the Chief's) promotion. At the time of the party, the Chief was a lieutenant, but was expected to soon replace the outgoing chief, who was retiring. Shortly after the party, the Chief received the permanent appointment.

The operative complaint alleged counts under the FCRA for sexual harassment and retaliation. The Employee alleged that the Chief made unwelcomed sexual advances at the party, which she rebuffed, causing adverse employment actions against her based on this rejection. After summary judgment resolved the sexual harassment count in the Village's favor, the case proceeded to a jury trial on the retaliation count, resulting in a verdict against the Village. The particulars of the case most favorable to the verdict and pertinent to our analysis are as follows.

*Events at the Party*

At trial, the Employee testified that during the party, there was a point when eight people were sitting around a table, including the Employee and the Chief. At that time, a male officer exposed himself to the group, which "apparently he does this a lot." People started passing around a dollar bill, and the Employee grabbed it, put it down her shirt, and said "it's safe in here." The Chief, who was sitting next to the Employee, stood up, put his hand down her shirt, and started to "feel her" under her bra, back and forth, and said, in response to the Employee's comment about the dollar's safety, "no, it's not." The Employee testified that she was "shocked" and "embarrassed," and when someone asked how it felt "down there," she uncomfortably replied that she does not have much to feel, to which the Chief responded: "What I felt felt pretty nice." Continuing to be embarrassed, the Employee left the table.

A short time later, a male Village police officer offered the Employee a ride home, since she did not feel safe driving at that point. The Chief came out and discouraged the male officer from giving her a ride home, saying "[w]e'll make sure she gets home okay."

2

Because she had a headache, the Employee asked the host if she could lie down for a little while, and he pointed her to the master bedroom. Another female officer went into the room with her, and they were only in there a short time when they were moved to another bedroom. The Employee told the female officer that she wanted to sleep, so the female officer left the room. The room was dark and the Employee was laying on her stomach, thinking she was alone. But she then felt someone rubbing her back, and when the person said she had "a nice back and such smooth skin," she could tell it was the Chief, so she sat up. She testified he then offered to give her a back rub, which she declined. The Chief next told her that he had always been attracted to her and "I always wanted to make love to you. Exact words. I will never forget it." At that point, the Employee responded:

> I said, listen, I know you're going through a hard time right now. You're separated from your wife. You're single. I understand that, but I am not. I am married. I have never cheated on my husband.

She testified that the Chief then grabbed her "hand and put my hand on his crotch to show me that he was – had an erection and said, this is what you do to me." She immediately left the room and "beelined it" to the female officer that had been with her earlier, they said goodbye, and left the party. She said she later told the female officer what happened. She also told the male officer who had offered to give her a ride home earlier.

*The Adverse Employment Actions*

The Employee then testified regarding some of the negative effects she felt in the aftermath of the party. She stated that at her next work day after the party, the Chief did not come into the dispatch office, which was unusual because coming to the dispatch office was his routine behavior. Three days after the party, the current chief of police took leave and made the Chief the acting chief of police. Shortly thereafter, the Chief was promoted to the position on a permanent basis.

The Employee testified that after the Chief was appointed, her immediate supervisor told her that she wanted to send her to a training course so that she could perform other functions in the police department. The Employee's attendance had to be approved by the Chief, but he denied the request. Attendance at the training course was significant to the Employee because on all of her evaluations prior to the most recent one, the Employee was given a "satisfactory" rating in all categories. In the most recent evaluation she was again given a "satisfactory" rating in all

categories, except for two. She received a less than satisfactory rating for the two categories because she missed a training prior to the evaluation and did not learn a skill she was asked to learn. Thus, she needed to go to the training that the Chief would not approve to restore her status of "satisfactory" for all categories of her evaluation.

The Employee also testified that nine months after the party, there was a position open to assist the evidence custodian. She stated that she and two other employees applied, and although one of the other applicants was selected, the Employee's immediate supervisor told her that she (the Employee) was the most qualified for the position. The immediate supervisor also commented that after she told the selection panel, including the Chief, that the Employee was the most qualified, the immediate supervisor was told she was "no longer needed" for the interview process.

Three months after the rejection for the first position, a temporary position became available to fill the Employee's immediate supervisor's position while the supervisor was on leave. However, the position was never posted, and the other applicant who did not get the first position was selected to fill the temporary role. The Employee testified that, although the other applicant had been an employee of the Village a few months longer than she, the Employee had four more years of dispatcher experience, including in other cities. She also testified that her immediate supervisor made it known that officers had complaints about the other applicant, and she herself heard officers complain that the other applicant "had an attitude problem."

A year and a half after the party, there was an incident where the Employee and the male officer who offered her a ride home from the party (who was also one of the two people the employee told about the party incident) were talking in the dispatch office. Both were written up for violating a policy of not discussing non-official business in the dispatch office. After the write up, the Employee testified that other officers were afraid to come into the dispatch room when she was there, because the Chief and deputy chief were looking at the door cards to see who was coming into the room when she was there. Also, her immediate supervisor, who was directed to give the write-up, told her, "I have no idea why they [the Chief and his deputy chief] hate you."

*The Verdict and Subsequent Proceedings*

After deliberating, the jury returned a verdict in favor of the Employee, awarding her $1,500 for lost wages and lost benefits damages, and

$400,000 in damages for pain and suffering.  The Village filed a combined motion to set aside the verdict, a renewed motion for directed verdict, and a motion for new trial, which was denied.  After the trial court entered final judgment awarding the sums in the verdict, the Village gave notice of appeal.  Thereafter, the Employee filed a motion for attorney's fees and costs, as the prevailing party in the FCRA action.  The Village moved for an order rejecting the Employee's entitlement to attorney's fees, arguing that the final judgment entered against the Village already exceeded the statutory cap on liability for the Village ($200,000), and therefore, no additional fees or costs could be added.  The trial court denied the Village's motion and entered a final judgment for attorney's fees and costs in favor of the Employee.  The Village again gave notice of appeal.  We subsequently consolidated the appeals.

*Analysis*

As discussed in the introductory paragraphs, we first analyze the denial of the directed verdict, explaining our affirmance.  We then address the jury instructions, explaining our reversal and remand for a new trial.

*Denial of Directed Verdict*

"The standard of review of an order denying a motion for directed verdict is *de novo*." *Hollywood Med. Ctr., Inc. v. Alfred*, 82 So. 3d 122, 125 (Fla. 4th DCA 2012).  "A motion for directed verdict should be granted when there is no reasonable evidence upon which a jury could legally predicate a verdict in favor of the non-moving party." *Etheredge v. Walt Disney World Co.*, 999 So. 2d 669, 671 (Fla. 5th DCA 2008) (quoting *St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs.*, 784 So. 2d 500, 504 (Fla. 5th DCA 2001)).

The Employee's retaliation claim was brought pursuant to the FCRA, more specifically, section 760.10(7), Florida Statutes (2016), which states:

> (7) It is an unlawful employment practice for an employer, an employment agency, a joint labor-management committee, or a labor organization to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.

§ 760.10(7), Fla. Stat. (2016).  To establish a prima facie claim for retaliation under section 760.10(7), a plaintiff must demonstrate that: (1)

he or she engaged in statutorily protected activity; (2) he or she suffered an adverse employment action; and (3) there is a causal relation between the two events. *See Donovan v. Broward Cty. Bd. of Comm'rs*, 974 So. 2d 458, 460 (Fla. 4th DCA 2008).

As we recently stated in *Palm Beach Cty. Sch. Bd. v. Wright*, 217 So. 3d 163 (Fla. 4th DCA 2017), "[w]e and other Florida districts have recognized that '[t]he FCRA is patterned after Title VII' and that 'federal case law on Title VII applies to FCRA claims.'" *Id.* at 165 (quoting *Guess v. City of Miramar*, 889 So. 2d 840, 846 n.2 (Fla. 4th DCA 2004)). Thus, in analyzing the directed verdict issue, we look to federal case law as well as Florida case law.

As can be seen from the statute, there are two categories of protected activity: activities that fit under the "opposition clause" and activities that fit under the "participation clause." Recognition of the two types of protected activity is also discussed in federal case law. *See, e.g., Bourne v. Sch. Bd. of Broward Cty.*, 508 F. App'x 907, 910 (11th Cir. 2013) ("Under Title VII and the FCRA there are two categories of protected activity: those activities that fit under the 'opposition clause' of 42 U.S.C. § 2000e–3(a) and those activities that fit under the 'participation clause.'"). The instant case involves the opposition clause.

In its initial brief, the Village summarized its contention that the trial court erred in denying its motion for directed verdict as follows:

> The [Employee] refused a one-time sexual advance by (1) communicating that she was married, (2) by communicating she had never cheated on her husband, and (3) by leaving the bedroom. Given the location of the conduct, the isolated nature of the incident, and the absence of any connection back to the Village, the evidence admitted during trial did not amount to "opposition" under the FCRA.

In weaving its argument for reversal, the Village asserts the denial of a directed verdict was error on two fronts: (1) the Chief's one-event sexual advances at a private party did not constitute an *unlawful employment practice*; and (2) the Employee's declination of the Chief's sexual advances was not *protected activity* under the FCRA because it did not qualify as *opposition* and provided no notice to the Village (emphasis indicates terms of art).

We discuss each argument in turn.

*a. The Chief's one-event sexual advances at a private party did not*

6

*constitute an unlawful employment practice.*

This argument has two subparts: (1) one-event sexual advances do not constitute an unlawful employment practice; and (2) sexual advances at a private non-work-sponsored party do not constitute an unlawful employment practice. There are no Florida state-court opinions discussing either sub-argument.

*One-Event Sexual Advances*

Our research reveals that most federal cases addressing sexual harassment and retaliation in the context of Title VII discuss fact patterns involving multiple instances of verbal or physical sexual behavior by a supervisor. We could find no federal appellate opinions explicitly opining that *one-event* sexual conduct cannot constitute sexual harassment or core facts for a retaliation claim under Title VII. However, it appears to us that the language of both the FCRA and Title VII is broad enough to encompass one-event physical sexual contact as an unlawful employment practice. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80, 118 S.Ct. 998, 1002 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits 'discriminat[ion] . . . because of . . . sex' in the 'terms' or 'conditions' of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements." (first alteration added)).

"Sexual harassment is without question an 'unlawful employment practice.'" *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015); *Scelta v. Delicatessen Support Servs., Inc.*, 57 F. Supp. 2d 1327, 1339 (M.D. Fla. 1999) ("'Sexual harassment is a form of sex discrimination prohibited by Title VII[,]' and the FCRA.") (alteration in original) (quoting *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998)). "Sexual harassment" has been defined by the United States Equal Employment Opportunity Commission ("EEOC"), the federal regulatory agency charged with enforcing Title VII, as follows:

> Harassment on the basis of sex is a violation of section 703 of title VII. *Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature* constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) *submission to or*

*rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual,* or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment . . . .

29 C.F.R. § 1604.11(a) (1999) (emphases added) (footnote omitted). As the federal courts do, we give deference to the definition of "sexual harassment" by the EEOC. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 92, 94 S.Ct. 334, 339 (1973) (explaining that EEOC's interpretation of Title VII should be given "great deference"); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-55 (1971) ("The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting [a provision of Title VII]. The administrative interpretation of the Act by the enforcing agency is entitled to great deference." (footnote omitted)).

The Supreme Court has made it clear, in the context of sexual harassment claims under Title VII, that "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 753-54, 118 S.Ct. 2257, 2265 (1998). The Court qualified that statement explaining that "[f]or any sexual harassment preceding the employment decision to be actionable, however, the conduct must be *severe* or pervasive." *Id.* at 754 (emphasis added). If a one-event sexual advance can support a sexual harassment claim under Title VII because it is severe, the same would hold true in the context of a retaliation claim.

In the instant case, the Employee contends she was treated differently by the Chief in the workplace and denied promotions by the Chief because she declined his sexual advances. The Chief not only groped the Employee's breast in front of others, he also sexually touched her by taking her hand and placing it on his erect penis, commenting on how arousing she was. We determine that it was for a jury to decide whether the Chief's sexual conduct constituted "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" within the EEOC guidelines and whether the conduct was "severe" enough to impose liability on the retaliation claim. *Burlington Indus.*, 524 U.S. at 753-54, 118 S.Ct. at 2265. We also hold that a one-event sexual conduct involving sexual organs can qualify as a prima facie showing to support a retaliation claim if it is severe enough. In other words, even setting aside

the sexual touching that occurred around the table in front of others (because, arguably, the Employee did not explicitly oppose the Chief's conduct), the sexual events that occurred in the bedroom were sufficient to allow the jury to resolve the issue.

*Location and Non-Work-Sponsored Event Context of Sexual Behavior*

The sexual behavior underlying the retaliation claim occurred at a private party that was not sponsored by the Village or its police department. However, it is clear from the evidence that many of the attendees were co-workers at the police department. Notably, the breast groping incident clearly occurred in front of several employees of the police department. We also note that, although not a work-sponsored event, the private party was to celebrate a fellow officer's promotion.

Regarding this sub-argument, our research shows that most of the federal cases addressing Title VII sexual harassment and retaliation claims discuss fact patterns involving instances of verbal or physical sexual behavior by a supervisor at a jobsite or off-premises work event. None of the federal opinions specifically address an argument about how the location or event context of the sexual behavior impacts the analysis. However, we are satisfied, in the instant case, the issue of location or event context of the sexual behavior makes no difference. That is because such characteristics are unimportant, for purposes of directed verdict, where the issue is whether "a tangible employment action *resulted* from a refusal to submit to a supervisor's sexual demands." *Id.* at 753 (emphasis added). Instead, in the instant case, such factors would have a bearing on the "severity-of-sexual-harassment" determination for the jury.

For the same reason (irrelevancy of the characteristics when deciding a directed verdict on retaliation claim), we reject the argument by the Village that the Employee herself did not view the Chief's conduct as sexual harassment at the time and therefore cannot prevail on her retaliation claim. The Village essentially argues that because the Employee did not even have a *subjective* belief at the time that the Chief's sexual conduct was an "employment practice," then her claim must fail. The crux of this argument revolves around the deposition testimony of the Employee that she did not "think" or "believe" that the Chief's sexual behavior around the party table or in the bedroom was an "employment practice."[1] As the

---

[1] We note that the Village's argument misses the mark, in that the questions posed during the deposition were framed in terms of the Chief's conduct being "an employment practice," rather than "an *unlawful* employment practice." The pertinent question for the jury was whether the Chief's conduct was an "unlawful

Supreme Court observed in *Meritor Savings Bank*, "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 2406 (1986). We are satisfied that the Employee made it evident to the Chief that she considered his sexual advances were wrongful conduct and "unwelcome." Moreover, it is inappropriate to deny a claim based on a witness's opinion regarding a legal term of art. *Cf. Cliff Berry, Inc. v. State*, 116 So. 3d 394, 403 n.6 (Fla. 3d DCA 2012) ("[T]he lay witness may not . . . testify as to a legal conclusion." (quoting *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001))). The bare assertion that it was not an "employment practice" (even assuming the witness understood the phrase was shorthand for "unlawful employment practice") is a legal conclusion as to an element of a cause of action and should be left for the finder of fact to conclude based on the evidence.

Thus, we disagree with the Village's first argument regarding the denial of its motion for directed verdict.

*b. The Employee's declination of the Chief's sexual advances was not protected activity under the FCRA because it did not qualify as "opposition" and provided no notice to the Village.*

The Village first contends that saying "no" to a supervisor's sexual advance is not protected activity contemplated by FCRA or Title VII. It argues that the Employee's communication, "I am married, I have never cheated on my husband," in response to a one-time sexual advance cannot be equated with the clear opposition required by the FCRA. The Village further argues that the Employee's willingness to have accepted a "private apology" is inconsistent with the opposition conduct discussed in the case law. The crux of the Village's argument is that the Employee's expressed desire to remain faithful to her husband and willingness to accept an apology demonstrates "an avoidance technique" to an "uncomfortable situation," rather than opposition to an unlawful employment practice.

There is a split among the federal appellate courts on the issue of "whether a person who rejects a supervisor's sexual advances has engaged in protected activity." *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (comparing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007) (holding that a single, express rejection of sexual advances does not constitute "protected activity" for purposes of a retaliation claim), with *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th

employment practice," instead of whether the conduct was something that the Village repeatedly engaged in or condoned.

Cir. 2000) (concluding that when the plaintiff told her supervisor to stop harassing her, she engaged in the most "basic form of protected conduct")). The Eleventh Circuit has not weighed in on this issue and, as mentioned above, no Florida appellate court opinion addresses the issue. However, in addition to the Fifth Circuit *LeMaire* and Eighth Circuit *Ogden* opinions, the Sixth Circuit and the Middle District of Florida have addressed the issue. After reviewing the limited case law on the issue, on the facts of this case, we agree with those courts which have concluded that a person who rejects a supervisor's sexual advances has engaged in protected activity.

We reject the position of the Fifth Circuit because in *LeMaire*, and the earlier unpublished opinion it cited, *Frank v. Harris County*, 118 F. App'x 799 (5th Cir. 2004) (unpublished), there was little legal reasoning offered to support the conclusion. In *LeMaire*, the issue was addressed with the simple statement; "LeMaire, however, provides no authority for the proposition that rejecting sexual advances constitutes a protected activity for purposes of a retaliation claim under Title VII," followed by a citation to *Frank*. *LeMaire*, 480 F.3d at 389. Likewise, in *Frank*, the Fifth Circuit, after identifying the employee's assertion on appeal, dismissed the argument with: "But Frank provides no authority for the proposition that a single 'express rejection' to [her supervisor's sexual advances] constitutes as a matter of law a protected activity for purposes of retaliation." *Frank*, 118 F. App'x at 804. Additionally, at the end of the single paragraph discussing the issue, the *Frank* court shifted to a causation analysis, faulting Frank for not reporting the behavior to the county or EEOC. *Id.*

The Eighth Circuit was the first federal appellate court to address the issue. In *Ogden,* the employee asserted sexual harassment and retaliation claims for her supervisor's sexual behavior. *Ogden*, 214 F.3d at 1002. The employer appealed the jury award on both claims, contending in part that the retaliation award should be reversed because Ogden did not engage in protected activity. *Id.* at 1007. According to the discussion of facts, Ogden experienced three occasions of unwanted sexual advances. On the first occasion, Ogden's intoxicated supervisor grabbed her by the waist and asked her to go to his motel room as the two were leaving a restaurant. *Id.* at 1003. She refused the invitation, pushed him away, and told him not to touch her. *Id.* On two other separate occasions, the supervisor was again intoxicated and put his arm around her at a bar, with a group of fellow employees present. *Id.* Each time, she pushed the supervisor away and told him to leave her alone. *Id.* In addition to these physical advances, the supervisor propositioned her incessantly. *Id.* It does not appear from the discussion of facts that Ogden complained about the behavior to fellow

employees, other members of management, or the company's human relations department.

On appeal, Ogden maintained that she engaged in "the most basic form of protected activity" when she told her supervisor to stop his offensive conduct. *Id.* at 1007. The Eighth Circuit affirmed the retaliation award saying:

> We agree with Ogden. Employers may not retaliate against employees who "oppose discriminatory conduct," *see* 42 U.S.C. § 2000e–3(a), and the jury reasonably concluded Ogden did so when she told [the supervisor] to stop his offensive behavior.

*Id.* (citing *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998)).

The Sixth Circuit addressed the issue in *New Breed Logistics*. There, the EEOC brought a claim against the employer, asserting a supervisor sexually harassed two employees and retaliated against them after they objected to his sexual advances. *New Breed*, 783 F.3d at 1061. The supervisor repeatedly made sexually suggestive comments to the employees. *Id.* at 1062. One employee testified she told the supervisor to "leave [her] alone" daily. *Id.* The other employee testified that in addition to the verbal conduct, the supervisor "pressed his stomach and private parts to her backside." *Id.* The other employee told the supervisor to stop touching her and on another occasion asked him to "stop talking dirty to [her]." *Id.* It does not appear from the discussion of facts that either employee complained about the behavior to fellow employees, other members of management, or the human relations department. Evidence was also adduced that the supervisor was directly or indirectly involved in each employee's termination. *Id.* at 1063. The employer moved for a directed verdict, contending the evidence was insufficient to prove the employees engaged in protected activity. *Id.* at 1067. The district court rejected this argument, concluding that protected activity "can be as simple as telling a supervisor to stop." *Id.*

On appeal, the employer asserted, among other things, that the evidence did not support the jury's retaliation verdict because neither employee engaged in protected activity constituting opposition. *Id.* at 1066. More specifically, the employer argued that "telling [the supervisor] to cease his harassment does not constitute protected activity under Title VII." *Id.* at 1067. In response, the EEOC argued that the district court's conclusion that protected activity can be as simple as telling a supervisor to stop was supported by the language of the opposition clause of Title

VII's anti-retaliation provision, as well as Supreme Court and Sixth Circuit precedent. *Id.* The Sixth Circuit agreed with the EEOC that a complaint to a harassing supervisor qualifies as protected activity. *Id.*

After examining the language of the Supreme Court in *Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 555 U.S. 271, 276, 129 S.Ct. 846 (2009), discussing the term "oppose" and its own prior precedent discussing an expansive definition of "opposing" conduct under the EEOC regulations, the Sixth Circuit reasoned:

> Applying these broad definitions, we conclude that a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII. Sexual harassment is without question an "unlawful employment practice." If an employee demands that his/her supervisor stop engaging in this unlawful practice—i.e., resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct. Importantly, the language of the opposition clause does not specify to whom protected activity must be directed. *Warren v. Ohio Dept. of Public Safety*, 24 F. App'x 259, 265 (6th Cir. 2001) ("Under the opposition clause, . . . [t]here is no qualification on who the individual doing the complaining may be or on who the party to whom the complaint is made."). Therefore, it would be unfair to read into the provision a requirement that a complainant only engages in protected activity when s/he opposes the harassment to a "particular official designated by the employer." *See Ross v. Baldwin Cnty. Bd. of Ed.*, No. 06–0275, 2008 WL 820573, at *6 (S.D.Ala. Mar. 24, 2008) ("It would be anomalous, and would undermine the fundamental purpose of the statute, if Title's VII's protections from retaliation were triggered only if the employee complained to some particular official designated by the employer.").

*New Breed Logistics*, 783 F.3d at 1067-68 (alterations in original)(footnote omitted).

We also note that the Middle District Court of Florida has also adopted the reasoning of the Sixth Circuit in *New Breed Logistics*. *See Charest v. Sunny-Aakash, LLC*, 2017 WL 4169701, *7 (M.D. Fla. Sept. 20, 2017).

We are satisfied that the evidence in this case supported the denial of the Village's motion for directed verdict. The Employee clearly opposed the

13

Chief's physical sexual advances in the bedroom by saying that she thought it was wrong to engage in sex with him and by exiting the room immediately after the Chief grabbed her hand and put it on his erection.

The Village's second contention is that the Employee's opposition was insufficient to provide the Village with notice of the sexual harassment. The Village essentially argues that the Employee's failure to tell some other authority in the Village structure about the Chief's conduct is fatal to her retaliation claim. The argument would have merit, perhaps, if the Chief's sexual behavior was of the type of conduct that had the purpose or effect of unreasonably interfering with work performance or creating an intimidating, hostile, or offensive working environment. However, in the instant case, the Chief's behavior did not adversely affect the Employee in the retaliation context until it resulted in adverse employment consequences. In the situation presented in this case, where vicarious liability is imposed because the employment decision by the supervisor itself constitutes a change in the terms and conditions of employment that is actionable under Title VII, the notice issue is irrelevant. *Burlington Indus.*, 524 U.S. at 760 ("Every Federal Court of Appeals to have considered the question has found vicarious liability when a discriminatory act results in a tangible employment action.").

Having addressed the various arguments asserted by the Village, we affirm the trial court's denial of its motion for directed verdict.

*The Jury Instruction Arguments*

The Village also challenges the jury instructions given.

> To demonstrate that the trial court erred in failing to give a requested jury instruction, a party must show "the requested instruction contained an accurate statement of the law, the facts in the case supported a giving of the instruction, and the instruction was necessary for the jury to properly resolve the issues in the case."

*Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 517 (Fla. 2015) (quoting *Barkett v. Gomez*, 908 So. 2d 1084, 1086 (Fla. 3d DCA 2005)).

The Village makes general arguments on appeal that the trial court's jury instructions were misleading because they (1) improperly characterized the Chief as an "employer"; (2) failed to address a variety of sub-issues related to the Village's defenses; (3) improperly used the terms "protected activity" and "unlawful employment practice;" (4) improperly used the phrase "a right to demand sex from her,"; and (5) gave no

guidance as to what constitutes "opposition" under the FCRA. However, the Village's arguments fail to provide sufficient detail to demonstrate trial court error. *Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979) ("In appellate proceedings the decision of a trial court has the presumption of correctness and the burden is on the appellant to demonstrate error."). Thus, we decline to address or find error as to those arguments.

The Village additionally argues on appeal that the trial court erred in its causation instructions for the retaliation claim. The instruction given by the trial court allowed the Employee to prevail by showing that her declination of the Chief's sexual advances at the party were "not completely unrelated" to the adverse employment actions she suffered. The causation instruction in the instant case is similar, if not exactly the same, as the instruction we recently determined to be erroneous in *Wright*.

In *Wright* we followed the long-standing rule of statutory construction that if a state law is patterned after a federal law on the same subject, the Florida law will be accorded the same construction as given to the federal act in the federal courts. *Wright*, 217 So. 3d at 164-65. Thus, because the Supreme Court changed the causation standard for Title VII retaliation claims in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013), to but-for causation, we receded from the "wholly unrelated" standard used in the Eleventh Circuit and this District. *Id.* at 165.

We see no material difference between the "not completely related" standard used by the trial court to instruct the jury in the instant case and the "wholly unrelated" standard we receded from in *Wright*. Although it is understandable why the trial court erred in instructing the jury, based on our previous case law, reversal and a new trial on the retaliation claim is required.

Because we reverse for a new trial, we also reverse the judgment for attorney's fees and costs. *See City of Hollywood v. Witt*, 939 So. 2d 315, 319 (Fla. 4th DCA 2006) ("[O]ur reversal of the underlying judgment in this appeal required reversal of the fee award.").

The trial court's denial of the Village's motion for directed verdict is affirmed. Because the trial court erred in instructing the jury on causation, we reverse the final judgment against the Village and remand the case for a new trial. Because we are remanding for a new trial, we also reverse the judgment for attorney's fees and costs.

*Affirmed in part, reversed in part, and remanded for a new trial.*

15

FORST and KLINGENSMITH, JJ., concur.

* * *

***Not final until disposition of timely filed motion for rehearing.***